REVISED December 10, 2009

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 8, 2009

Charles R. Fulbruge III
Clerk

No. 07-31019

————

GRAND ISLE SHIPYARD INC; GRAY INSURANCE COMPANY,

Plaintiffs - Appellees

v.

SEACOR MARINE, LLC,

Defendant - Appellant

————

Appeal from the United States District Court
for the Eastern District of Louisiana

————

Before JONES, Chief Judge, KING, JOLLY, DAVIS, WIENER, BARKSDALE, GARZA, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, and HAYNES, Circuit Judges.[*]

W. EUGENE DAVIS, Circuit Judge:

I.

The question presented by this appeal is what law governs the resolution of a contractual dispute, here enforceability of an indemnity provision, when the act or omission that causes the underlying death, bodily injury, or property damage (hereafter, the "tort") which triggered the contractual indemnity claim

_____

[*] Judge Smith is recused and did not participate.

occurred on navigable water on the Outer Continental Shelf ("OCS"), but the contract that creates the indemnity obligation between the parties calls for a majority of the work to be performed on stationary platforms on the OCS. Central to this issue is the application of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, et seq. ("OCSLA").

The law is clear that when a tort occurs on navigable water on the OCS, as opposed to, for example, a stationary platform, and a non-seaman is injured, maritime law applies to the ensuing tort action by that worker against third parties. Some of our cases have applied this same rule to a contractual indemnity dispute and looked to the site of the tort to determine the situs of the controversy, the first step in deciding what law applies. Instead of looking to the site of the tort, other cases have applied what amounts to a focus-of-the-contract test which looks to where the contract contemplates that most of the work will be performed: if a majority of the performance called for by the contract is on stationary platforms on the OCS, that is the situs of the controversy for purposes of determining whether the law of the adjacent state applies as surrogate federal law. If a majority of the work called for by the contract is aboard vessels on navigable water on the OCS, this is the situs of the controversy.

We hold that the focus-of-the-contract test is the appropriate test to apply in determining the situs of the controversy in contract cases, and we adopt that rule for the circuit. We therefore agree with the trial judge that because the relevant contract contemplated that a majority of the contractor's work would be performed on stationary platforms on the OCS, this should be deemed the relevant "situs" for the instant indemnity dispute and because none of the other factors lead us to apply any other law, we must apply Louisiana law. When we apply Louisiana law, the Louisiana Oilfield Indemnity Act, LA. REV. STAT. ANN. § 9:2780(A) ("LOIA") renders the indemnity agreement at issue unenforceable, so we affirm the summary judgment in favor of Grand Isle.

## II. FACTS

This declaratory judgment action involves an indemnity dispute between Grand Isle and Seacor, two contractors of BP American Production Company ("BP"). Grand Isle's contracting duties involved the repair and maintenance of BP's offshore platforms, while Seacor's duties involved the transporting of workers for BP and its contractors. The indemnity dispute in this case arises from an April 2005 incident in which Denny Neil, a Grand Isle employee, was injured in a fall onboard the M/V SEA HORSE IV, a vessel owned and operated by Seacor. At the time of the accident, the SEA HORSE IV was transporting Neil from his work platform to the residential platform which contained his living quarters. Deposition testimony indicated that the vessel was in close proximity to the residential platform at the time of the accident, but it is undisputed that neither Neil nor the SEA HORSE IV were in physical contact with the platform when the accident occurred.

Neil filed suit against Seacor in the U.S. District Court for the Southern District of Texas, asserting a claim for vessel negligence under § 905(b) of the Longshore and Harbor Worker's Compensation Act ("LHWCA"). Seacor tendered its defense and indemnity to Grand Isle; Seacor also claimed the benefit of insurance provided by Grand Isle's insurer Gray. On March 17, 2006, Grand Isle and Gray filed suit in the U.S. District Court for the Eastern District of Louisiana, seeking a declaratory judgment that: (1) Grand Isle is not contractually obligated to defend and indemnify Seacor; and (2) Seacor is not entitled to insurance coverage from Gray.

Grand Isle and Gray subsequently filed motions for summary judgment in which they argued that by virtue of OCSLA, the LOIA applies as surrogate federal law in this case, thus invalidating the contractual indemnity provision at issue here; and (2) that § 905(b) of the LHWCA is applicable to the case and prohibits enforcement of the indemnity provision. Seacor filed its own cross motion for summary judgment, maintaining that general maritime law governs the dispute and noting that nothing in that law prohibits the indemnity agreement at issue here.

Grand Isle Shipyard, Inc. v. Seacor Marine, LLC, 543 F.3d 256, 257–58 (5th Cir. 2008) (hereinafter Grand Isle (Panel)), vacated, 569 F.3d 523 (5th Cir. 2009) (en banc).  Seacor seeks indemnity under the contract between Grand Isle and BP. Paragraph 14.07 of that contract[1] is virtually identical to the indemnity agreement in a contract between BP and Seacor, "and neither party disputes that BP sought thereby to impose reciprocal indemnity obligations among its contractors." Id. at 258.  The undisputed objective was for each contractor whose employee was injured to hold harmless and indemnify BP (and other contractors engaged by BP on the jobsite) for liability resulting from injuries to or death of that employee. The material facts are not in dispute.

The ultimate legal issue before the district court and the panel, and now before the full court, is whether the adjacent state law of Louisiana, including the LOIA, applies to the case.  The parties agree that if the LOIA does apply,  it invalidates Grand Isle's indemnity obligation to Seacor, but if Louisiana law and the LOIA do not apply, the indemnity agreement is enforceable.

---

[1] Paragraph 14.07 reads:

> Contractor [Grand Isle] agrees to defend, indemnify, release and hold company's other contractors harmless in accordance with the provisions of this Article 14 (to the extent such other Contractors execute cross indemnification provisions substantially similar to those contained in this section 14.07) from and against all claims, liabilities, damages, and expenses (including without limitation attorney's fees and other costs of defense), irrespective of insurance coverages for the following: 14.07.01(I) all injuries to, deaths, or illnesses of persons in Contractor Group: ... whether or not occasioned by or the result in whole or in part of the negligence or fault, whether sole, concurrent, joint, active, or passive, of company's other contractors or any other entity or person or the unseaworthiness of any vessel.

"Contractor Group" is defined in Paragraph 14.01.03 as "the following entities and persons individually and collectively: Contractor [Grand Isle Shipyard, Inc., per the preamble to the contract] and its Affiliates, its subcontractors and their Affiliates, and the officers, directors, employees, agents, and representatives of all of those entities . . . ."

To determine whether OCSLA required application of state law to this dispute, the district court applied the three-part test that the Supreme Court formulated in Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352 (1969). We have applied that test in a number of cases, including Union Texas Petroleum Corp. v. PLT Engineering, Inc., 895 F.2d 1043, 1047 (5th Cir. 1990) (hereinafter PLT). As we articulated the Rodrigue test in PLT, for state law to apply as surrogate federal law, three conditions must be met: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." Id.

Here, the district court first considered whether the indemnity controversy arose on an OCSLA situs, i.e., on a stationary platform or other location on the OCS as provided for in OCSLA. In considering this first PLT condition, the district court determined that the OCSLA situs requirement was met because (1) the situs of the contract containing the indemnity agreement at issue depends upon the location where performance of the work is called for by the contract, and (2) the contract between Grand Isle and BP contemplated that most of the work was to be performed on BP platforms, i.e., OCSLA covered situses. Grand Isle Shipyard, Inc. v. Seacor Marine, LLC, 2007 WL 2874808, at *3 (E.D. La. 2007) (hereinafter Grand Isle (District)).[2] The court also found that the second and third PLT conditions were met. Id. at *4–5. Accordingly, the

---

[2] The district court also relied on a well-reasoned district court opinion, Wagner v. McDermott, Inc, 899 F. Supp. 1551 (W.D. La 1994), aff'd. 79 F.3d 20 (5th Cir.), cert. denied, 519 U.S. 945 (1996). The district court in Wagner stated: "Thus, under Union Texas, the OCSLA situs factor is met in the instant case, as the work required by the contract was performed on an offshore platform." Id. at 1556. The court of appeals affirmed on an alternate ground.

district court granted Grand Isle's and Gray's motion for summary judgment and denied Seacor's motion. Id. at *6.

Seacor timely appealed, and the panel reversed. The panel concluded that because Neil's accident occurred on a vessel on navigable water above the OCS and not on a situs expressly covered under the OCSLA, this indemnity dispute did not arise on a covered situs; thus, it was unnecessary to address the second and third prongs of the PLT test. Grand Isle (Panel), 543 F.3d at 259–60. The panel therefore concluded that the LOIA could not apply as surrogate federal law to void the indemnity agreement, and it vacated and remanded on that basis. Id. at 263–64. We granted Grand Isle's petition for rehearing en banc to address this important question of law.

## III. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. "[W]e review de novo the district court's order granting [Grand Isle's and Gray's] motion for summary judgment under Rule 56 and apply the same standard as did the district court." Cornerstone Christian Schs. v. Univ. Interscholastic League, 563 F.3d 127, 133 (5th Cir. 2009).

## IV. ANALYSIS

As indicated above, the critical question we must answer is what law applies. The answer to this question depends on the applicability of the OCSLA to the uncontradicted facts. More particularly, in PLT terms, we must identify the "situs" of the controversy.

In deciding this question we begin with the governing statute, OCSLA, which provides in pertinent part:

> (2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of

the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf. . . .

43 U.S.C. § 1333(a)(1), (2)(A).

The Supreme Court in Rodrigue stated that "[t]he purpose of the [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the fixed structures . . . on the outer [sic] Continental Shelf." 395 U.S. at 355. As we noted in PLT, "Rodrigue made clear that 'for federal law to oust adopted state law, federal law must first apply.'" 895 F.2d at 1047 (quoting Rodrigue, 395 U.S. at 359). To determine whether state law applies, the PLT court expressed the three-part test stated above.[3] In PLT, the court began its analysis by looking to Rodrigue, a seminal case interpreting OCSLA.

Rodrigue was a consolidated case involving two separate wrongful death actions. In one, a crane operator on a stationary platform was killed when the crane collapsed and toppled over. In the other, the decedent was killed when he fell from a derrick above a stationary platform to the floor of the platform. The defendants argued that the Death on the High Seas Act, 46 U.S.C. § 76, et seq. ("DOHSA"), applied; the survivors sought application of the Louisiana Wrongful Death Act. For both cases, the Supreme Court held that because the deaths occurred on stationary platforms on the Outer Continental Shelf—each a covered situs under OCSLA—Louisiana law applied as surrogate federal law through OCSLA. Rodrigue, 395 U.S. at 355. Thus, in a tort action, Rodrigue

---

[3] "(1) The controversy must arise on a situs covered by OCSLA (i.e., the subsoil seabed, or artificial structure permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with federal law." 895 F.2d at 1047.

illustrates that the OCSLA situs requirement is met if the tort occurs on a platform or other OCSLA covered situs as provided in § 1333(a)(2)(A).

The converse is equally clear. In a tort action, if the tort occurs on navigable water instead of a fixed platform (or other structure attached to the seabed), the OCSLA situs requirement is not met. For example, in Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207 (1986), a helicopter ferrying platform workers home after they finished their shift on a stationary platform crashed and two offshore workers drowned. The Court was called upon to decide whether DOHSA applied or the Louisiana wrongful death statute applied as surrogate federal law under OCSLA. 477 U.S. at 209. The Court concluded that because the incident occurred more than a marine league from shore, DOHSA applied, stating:

> Here, admiralty jurisdiction is expressly provided under DOHSA because the accidental deaths occurred beyond a marine league from shore. See 46 U.S.C. § 761. Even without this statutory provision, admiralty jurisdiction is appropriately invoked here under traditional principles because the accident occurred on the high seas and in furtherance of an activity bearing a significant relationship to a traditional maritime activity.

Id. at 218–19.

In concluding that OCSLA did not call for application of state law when the incident did not occur on an OCSLA situs, the Tallentire Court stated:

> The intent behind OCSLA was to treat the artificial structures covered by the Act as upland islands or as federal enclaves within a landlocked State, and not as vessels, for purposes of defining the applicable law because maritime law was deemed inapposite to these fixed structures.

Id. at 217 (citing Rodrigue, 395 U.S. at 361–66).

Although it is clear that Rodrigue and Tallentire provide the situs rule for tort cases, it does not follow that contract cases triggered by an underlying tort

depend on the situs of that tort, i.e., the location of that occurrence. Notably, PLT was a pure contract case to collect unpaid invoices for the installation of a subsea pipeline and to impose a statutory lien on the pipeline under Louisiana law. 895 F.2d at 1045–46. PLT and its subcontractors relied on Tallentire (and OCSLA itself) for the proposition that the controversy arose on an OCSLA situs and state lien law applied. Id. at 1049–50. Union Texas Petroleum Corp. argued that state law did not apply because

> [A]ll of the subcontractors' contracts for the building and completion of the pipeline called for services which were provided from vessels and by divers in the ocean, not on a platform, and therefore were not in areas covered by OCSLA.

Id. at 1047. Judge Brown, writing for the panel in PLT, held, however, that despite the fact that some of the work was performed from vessels, state law did apply.

> In the first place, the gathering line exactly fits the statutory definition of an "other device[] permanently or temporarily attached to the seabed . . . erected thereon for the purpose of . . . developing, or producing resources therefrom." 43 U.S.C. § 1333(a)(1). In addition, the gathering line was buried beneath the ocean floor. It was connected to a platform at one end. It was connected to a transmission line at the other. The locations where the substantial work was done were covered situses—the subsoil or seabed; an artificial island; and an installation for the production of resources. Thus the first condition [situs] is met.

Id. at 1047–48 (footnotes omitted) (emphasis added). To determine situs, the PLT panel did not focus on where the underlying incident that gave rise to the contract claim occurred (i.e., the nonpayment of the subcontractors) but looked instead to where the work under the contract was performed.[4]

---

[4] See Julia M. Adams & Karen K. Mihollin, Indemnity on the Outer Continental Shelf—A Practical Primer, 27 TUL. MAR. L. J. 43, 53 (2002).

Later cases ostensibly applying PLT to contractual indemnity claims have ignored the situs of the contract and looked instead to the situs of the underlying tort. Those cases essentially hold that the location of the underlying tort determines the "situs of the controversy" without regard to where the majority of the work under the contract was to be performed. For example, in Hollier v. Union Texas Petroleum Corp., 972 F.2d 662, 663–64 (5th Cir. 1992), a worker was crushed between a boat and a stationary platform and then drowned. His survivors filed a wrongful death action against the platform and vessel owners, and the platform owner in turn filed a third-party demand seeking contractual indemnity. Id. at 664. The underlying tort claim settled, leaving only the contractual indemnity claim to be decided on appeal. Id. In analyzing the situs element of the PLT test, the Hollier panel did not consider or discuss the contract's situs—where the work was performed under the contract—but looked exclusively to the situs of the underlying incident. Id. at 664–65.

Likewise, in Smith v. Penrod Drilling Corp., 960 F.2d 456, 458 (5th Cir. 1992), the underlying incident (an injury on a drilling platform) settled, leaving only a contractual indemnity claim on appeal. As in Hollier, the Smith panel did not discuss the situs of the contract under the first prong of the PLT test; it looked only to the situs of the underlying incident. Id. at 459.

Indeed, in neither Hollier nor Smith did we make an explicit choice between the situs of the contract and the situs of the underlying incident; we simply determined that the situs of the underlying incident controlled without discussion. The confusion is evident in Hodgen v. Forest Oil Corp., 87 F.3d 1512, 1527 (5th Cir. 1996), in which the panel stated: "Assuming without deciding that Hollier and Smith state a rule in this circuit providing that the situs of the controversy in an OCSLA indemnity clause case is the location of the accident, we agree with the district court and find that the situs requirement is met in this case" because the underlying incident occurred on an OCSLA situs. See also

Demette v. Falcon Drilling Co., Inc., 280 F.3d 492, 498 (5th Cir. 2002) (finding that OCSLA situs existed for both a tort claim and the related indemnity claim—without distinguishing between the two—because the accident took place on an OCSLA situs); Adams & Milhollin, supra note 4, at 54 (noting Hollier and Hodgen's failure to look to the contract for situs). Instead of following PLT in these contract cases and applying general contract principles, we applied tort principles and looked to the location of the underlying incident for OCSLA situs.

Our case law, however, requires us to distinguish between a contractual indemnity claim and the underlying incident. For instance, in Sumrall v. Ensco Offshore Co., 291 F.3d 316 (5th Cir. 2002), we explained that in an earlier case, "although the underlying claim creating the obligation for which Shell Oil sought indemnification from Sladco sounded in tort, the obligation for which Shell sought indemnification itself was contractual in nature, as it arose from the agreement between Shell and Diamond M." Id. at 319 (citing Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 333 (5th Cir. 1981)) (emphasis in original).

Here, the district court followed PLT, which analyzed the indemnity action as a contract claim rather than as a tort claim. On appeal, however, the panel followed those of our cases that had determined OCSLA situs using tort principles. The opposed positions of the district court and the panel both find support in our case law, which all can agree is conflicting and confusing.[5] We

---

[5] See, e.g., David W. Robertson, The Outer Continental Shelf Lands Act's Provisions on Jurisdiction, Remedies, and Choice of Law: Correcting the Fifth Circuit's Mistakes, 38 J. MAR. L. & COM. 487 (2007); E. Stewart Spielman, Drilling Through the Muddied Waters on the Outer Continental Shelf: An Examination of the Fifth Circuit's Recent Decision in Demette v. Falcon Drilling Co., 26 TUL. MAR. L.J. 683, 694 (2002) ("'In each new case, a panel of this court must comb through a bewildering array of cases that rely upon inconsistent reasoning in the hope of finding an identical fact situation.'" (quoting Smith, 960 F.2d at 461)); Adams & Milhollin, supra note 4, at 100–01 ("Presumably, the lawyer now knows whether the indemnity at issue is enforceable, having completed the various analyses and determinations required under the OCSLA. It is highly likely, however, that the office aspirin bottle is now empty. . . . We can only hope that maritime lawyers everywhere take comfort in the fact that no matter how well they adhere to the tests and guidelines, one out of every two at the end of the exercise will

granted en banc consideration of this case to clarify this area and to resolve at least some of the conflict among our cases.

Once we recognize that the claim for indemnity is a claim based in contract rather than in tort, we see no reason to apply tort analysis to determine where the contractual controversy arose. It makes more sense to apply a focus-of-the-contract test and say that a contractual dispute—the "controversy" under the first condition of the PLT test—arises under an OCSLA situs if a majority of the work called for by the contract is on stationary platforms or other enumerated OCSLA situses.[6]

This approach is sounder because it applies contract principles rather than tort principles to a contract case. Applying tort rules would allow the fortuitous location of an accident to determine the situs—and the applicable law—of a contractual controversy. The tort-situs approach prevents commercial parties from reliably allocating risk in their contractual arrangements because they have no way of predicting where "controversies" might arise and thus no way of knowing which law will govern.

Using contract principles to establish the situs of a contractual dispute both maintains the longstanding rule treating contractual indemnity claims as

---

have a different answer as to what law applies, and whether the indemnity is enforceable."); Kenneth G. Engerrand, Primer of Remedies on the Outer Continental Shelf, 4 LOY. MAR. L.J. 19, 20 (2005).

[6] As we discussed in Davis & Sons v. Gulf Oil Corp., 919 F.2d 313, 315–17 (5th Cir. 1990), reh'g denied, 924 F.2d 1054 (5th Cir. 1991), it is a common practice for companies contracting for work in the oilfield to enter into contracts in two stages. Typically, they first sign a "blanket contract" that may remain in place for an extended period of time. Later, they issue work orders for the performance of specific work, which usually incorporates the terms of the blanket contract. As we said in Davis & Sons, where the contract consists of two parts, a blanket "contract followed by later work order, the two must be interpreted together."

Generally, each work order is for a discrete, relatively short-term job. Unless a contrary intent is reflected by the master contract and the work order, in determining situs in a contract case such as this, courts should ordinarily look to the location where the work is to be performed pursuant to the specific work order rather than the long term blanket contract.

separate from underlying tort claims and grants contracting parties a far greater measure of predictability and stability in allocating risk.

For the reasons set forth above, we hold that, in determining the first condition of the PLT test, a contractual indemnity claim (or any other contractual dispute) arises on an OSCLA situs if a majority of the performance called for under the contract is to be performed on stationary platforms or other OCSLA situses enumerated in 43 U.S.C. § 1333(a)(2)(A). It is immaterial whether the underlying incident that triggers the indemnity obligation occurs on navigable waters or on a platform or other OSCLA situs. A number of our cases have determined situs in a contractual indemnity case not by looking at the focus of the contract, but rather looking at where the underlying accident occurred which gave rise to the indemnity claim.[7]  Many of those cases, we

---

[7] Judge Garza's straightforward dissent agrees with Seacor's position and relies on this line of cases. We have explained above why we decline to follow these cases.

Judge Owen's dissent adopts a position that neither of the parties nor their experienced admiralty attorneys argued to the district court, the panel, or the en banc court. She concedes that in tort cases, § 1333(a)(2)(A) of OCSLA directly adopts the law of the adjacent state as the law of the United States on artificial islands and fixed structures on the OCS. A contrary position is obviously foreclosed by the Supreme Court's decisions in Rodrigue and Chevron Oil Co. v. Huson, 404 U.S. 97 (1971). In those cases the Court directly applied the law of the adjacent state without regard to the state's conflict rules. Judge Owen contends, however, that in contract cases, § 1333 (a)(2)(A) should be interpreted differently. In contract cases, she argues that when this section of OCSLA adopts the "civil and criminal laws of each adjacent state," this language should be interpreted as adopting the adjacent state's conflict of law rules. We see no basis to read this section of OCSLA to directly apply the state's law in a tort case while adopting the state's conflict of law rules in a contract case. The section unambiguously adopts the "civil and [criminal] laws of the adjacent state" without distinguishing between the types of civil cases. We see no reason to treat contract cases and tort cases differently for choice of state law purposes since they are both "civil" cases.

In tort cases, the Supreme Court has given us clear directions to directly adopt the adjacent state's law rather than to adopt that state's conflict rules. In Huson, the Court considered whether Louisiana's one year statute of limitations would bar a tort action which occurred on a platform on the OCS. Id. at 98–99. The court considered plaintiff's argument that the Louisiana one year statute should not apply because under Louisiana's conflict rules, "prescriptive" (as opposed to peremptive) rules are not binding outside the forum. Id. at 99–103. The Court rejected that argument and immediately following that discussion stated that "[s]ince the federal court is not, then, applying the law of another forum in the usual

believe, ultimately reach the correct result for other reasons, and with respect to the extent (and only to that extent) the "tort" analysis was used in those cases to determine situs, we disagree and overrule that portion of those opinions.[8]

We therefore agree with the district court that the indemnity dispute in this case arose on an OCSLA situs because it is uncontested that a majority, if not all, of the work called for under the contract was to be performed on stationary platforms on the OCS.

The appellant does not challenge the district court's conclusion that the second and third PLT conditions are met and we agree with the district court's

---

sense, ordinary conflict of law principles have no relevance." Id. at 102–03 (emphasis in original).

In Gulf Offshore Co. v. Mobil Oil Co., 453 U.S. 473 (1981) the Court dealt primarily with whether state courts had concurrent jurisdiction over suits arising under OCSLA. The Court concluded that nothing within the Act prevented state jurisdiction but it reiterated the rule announced in Huson that "OCSLA does supercede the normal choice of law rules that the forum would apply." Id. at 482 n.8. The Court in Rodrigue directly applied Louisiana's wrongful death act to a wrongful death that occurred on a platform on the OCS without any discussion of conflict of law principles.

Judge Owen seems primarily concerned with the potential problem that the rule we adopt in this case does not cover the situation where the contract calls for work on platforms off the coast of both Louisiana and Texas under circumstances where the contract would be enforceable in one state but not in the other. That set of facts is not before us in this case and the legal issues such a case presents have not been briefed or argued. In this case, the parties agree that if the adjacent state law applies, Louisiana law, including the Louisiana Oilfield Indemnity Act, is the applicable law. And there is no evidence in the record that the contract called for work anywhere other than off the coast of Louisiana.

In sum, we believe Judge Owen's position is inconsistent with a plain reading of § 1333(a)(2)(A) of OCSLA, cannot be reconciled with the interpretation of that statute by the Supreme Court, and has no relevance to the issues in this case.

[8] The opinions we refer to include the following: Diamond Offshore Co. v. A & B Builders, 302 F.3d 531, 546 (5th Cir. 2002) (remanding for the district court to determine OSCLA situs based on the location of the injury); Demette, 280 F.3d at 500 (defining OSCLA situs in a contractual indemnity case by the location of the underlying tort); Hodgen, 87 F.3d at 1527 (stating that "the situs of a controversy in an OSCLA indemnity clause case is the location of the accident"); Smith, 960 F.2d at 459 (stating that the controversy occurred on an OCSLA situs because the injury occurred on a platform); Hollier, 972 F.2d at 664 (defining OSCLA situs in a contractual indemnity dispute by the location of the underlying tort).

conclusion in this respect. As to the second condition, the district court determined that this contract, which called for maintenance work on a stationary platform located on the OCS, was not a maritime contract and therefore maritime law did not apply of its own force. Grand Isle (District), at *4. As to the third condition, as the district court noted, "[t]he Fifth Circuit has specifically held that 'nothing in the LOIA is inconsistent with federal law.'" Id. at *5 (quoting Hodgen, 87 F.3d at 1529). We agree with these conclusions.[9]

Having determined that all three conditions of the PLT test are met, it follows that the adjacent state law of Louisiana[10] will apply as surrogate federal law and that the LOIA renders the indemnity agreement unenforceable. The district court correctly granted summary judgment to Grand Isle and Gray.

AFFIRMED.

---

[9] Our analysis adopts the PLT test in the order set forth by the PLT court. However, in determining whether state law applies in an OCSLA action, predicated on a contract, it is permissible to consider whether the contract at issue is a maritime contract before considering whether OSCLA situs has been established. Thus, if the contract sued upon is a maritime contact, maritime law applies and state law has no application so that the situs question need not be answered. However, if the contract sued upon is a non-maritime contract, then the situs question must be answered.

[10] Seacor also argues in passing that the provision in the Grand Isle contract that chooses maritime law as the applicable law should govern this contractual claim. We disagree. As we said in PLT: "We find it beyond any doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary." 895 F.2d at 1050 (citations omitted). See also Gulf Offshore Co., 453 U.S. 473; Texaco Exploration & Production, Inc. v. AmClyde Engineered Products Co., 448 F.3d 760 (5th Cir. 2006).

EMILIO M. GARZA, Circuit Judge, with whom JENNIFER WALKER ELROD and LESLIE H. SOUTHWICK, Circuit Judges, join, dissenting:

We are asked to determine whether the Outer Continental Shelf Lands Act choice-of-law provision, 43 U.S.C. § 1333(a)(2)(A), requires application of the Louisiana Oilfield Indemnity Act to an indemnity agreement triggered by an injury to a platform worker that occurred on a vessel on the high seas. Pursuant to a "focus-of-the-contract" test, and directly contrary to the Supreme Court's admonishment that Congress meant for situs to be determined by locale and not by the status of the employee or his work, the majority says yes. There being no nexus between the indemnification agreement and the Outer Continental Shelf, and because a breach of a contract based exclusively on an injury on the high seas cannot apply state law to the dispute, I would say no, and respectfully dissent.

## I.

The choice-of-law provision under the Outer Continental Shelf Lands Act ("OCSLA") states in pertinent part:

> To the extent that they are applicable and not inconsistent with this Act or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

43 U.S.C. § 1333(a)(2)(A). Importantly, § 1333(a)(2)(A) declares the law of the United States[1] to be state law only on certain specific and fixed locations.

---

[1] OCSLA sets forth the geographical boundaries of federal jurisdiction as follows:

The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices

OCSLA's primary concern is "to treat the artificial structures covered by the Act as upland islands or as federal enclaves within a landlocked State, and not as vessels, for the purposes of defining the applicable law because maritime law was deemed inapposite to these fixed structures." Offshore Logistics v. Tallentire, 477 U.S. 207, 217 (1986). Thus, § 1333(a)(2)(A) requires a geographical nexus before state law applies.

The pertinent state law at issue here is the Louisiana Oilfield Indemnity Act ("LOIA"), which "declare[s] null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee." LA. REV. STAT. ANN. § 9:2780(A) (2009). Thus, if LOIA applies to the indemnity provision, it is unenforceable; if LOIA does not apply, the indemnity clause may be given effect.

OCSLA's plain language extends all laws)) "civil and criminal")) of the adjacent state to "that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon." Put simply, § 1333(a)(2)(A) invites us to determine whether the situs of an indemnity agreement has a geographical nexus with the Outer Continental Shelf ("OCS"); if it does, we apply the relevant state law as surrogate federal law governing the agreement. If no situs is found, our inquiry begins and ends there.

---

permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . .

§ 1333(a)(1) (emphasis added). The parties do not dispute that OCSLA extends federal law to the areas of the OCS enumerated above.

II.

Grand Isle Shipyard, Inc. ("Grand Isle") entered into a Master Maintenance and Construction Services Contract ("MMCSC") with BP American Production Company ("BP") to provide repair and maintenance on fixed platforms on the OCS. Separately, Seacor Marine LLC ("Seacor") and BP entered into a Vessel Charter Contract ("Charter") pursuant to which Seacor supplied vessels and crew to BP in service of BP's offshore activities. Both contracts contain nearly identical language designed to create reciprocal defense and indemnity obligations between and among BP contractors.

During the course of this contractual arrangement, Grand Isle employee Denny Neil was injured in a fall onboard the M/V SEA HORSE IV, a vessel owned and operated by Seacor and traveling on the high seas beyond Louisiana's territorial waters. Neil was off duty, and the SEA HORSE IV was transporting Neil from his work platform to his residential platform when he fell. According to deposition testimony, neither Neil nor the SEA HORSE IV was in physical contact with the platform at the time of the incident.

Neil filed suit against Seacor under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), a maritime statute, claiming negligent maintenance of the SEA HORSE IV resulting in his injury. Seacor settled this claim with Neil. After Neil filed his suit, Seacor tendered its defense and indemnity to Grand Isle pursuant to MMCSC paragraph 14.07 (emphasis added):

> Contractor [Grand Isle] agrees to defend, indemnify, release and hold company's [BP] other contractors [e.g., Seacor] harmless in accordance with the provisions of this Article 14 (to the extent such other Contractors execute cross indemnification provisions substantially similar to those contained in this section 14.07) from and against all claims, liabilities, damages, and expenses (including

without limitation attorney's fees and other costs of defense), irrespective of insurance coverages for the following:

(i) all injuries to, deaths, or illnesses of persons in contracted group CG:

. . . whether or not occasioned by or the result in whole or in part of the negligence or fault, whether sole, concurrent, joint, active, or passive, of company's other contractors or any other entity or person or the unseaworthiness of any vessel . . . .

Grand Isle denied Seacor's tender for defense and indemnity and filed a complaint in district court seeking a declaratory judgment that Louisiana law applies as surrogate federal law under OCSLA. Seacor answered, alleging that, inter alia, "an action pending in the United States District Court for the Southern District of Texas . . . involves the dispute underlying this claim." Grand Isle subsequently moved for summary judgment on the ground that LOIA applies as surrogate federal law under OCSLA to nullify the indemnification provision in Seacor's contract with BP. Seacor filed a cross motion for summary judgment, arguing, inter alia, that Neil's injury occurred on a vessel while it was navigating in and on the high seas, and, therefore, under federal maritime law, Seacor would be entitled to indemnification for Neil's injury by Grand Isle per the terms of the MMCSC.

## III.

State law may be applicable to this dispute in one of two ways: either ex proprio vigore or as surrogate federal law under OCSLA's choice-of-law provision. Louisiana law does not apply to this dispute ex proprio vigore because Neil's injury occurred eleven geographical miles offshore, well beyond Louisiana's territorial waters. See 43 U.S.C. §§ 1301(b) (defining coastal "boundaries" of a state bordering the Gulf of Mexico as no farther than three

marine leagues (3.45 geographical miles) into the Gulf). If Louisiana law applies to this dispute at all, it is only because it is incorporated as surrogate federal law by § 1333(a)(2)(A).

OCSLA's choice-of-law provision requires that a dispute have a geographical nexus with the OCS in order for state law to be applied as surrogate federal law. The dispute here involves breach of an indemnity provision incorporated within the MMCSC. Grand Isle neither alleges nor presents evidence in support of its motion for summary judgment that the MMCSC was written, confected, executed, or breached on the OCS. And although the MMCSC governs work done by Grand Isle on BP's platforms (which could provide a nexus to the OCS), the dispute in this case neither implicates the work on the platforms nor has any other connection to the OCS. Accordingly, the mere fact that the dispute involves a provision within the MMCSC does not implicate the OCS such that OCSLA would apply.

Because the contract itself has no geographical nexus with the OCS, we look to the situs of the "controversy" to determine if § 1333(a)(2)(A) requires application of Louisiana law to this dispute. See Union Tex. Petroleum Corp. v. PLT Eng'g, 895 F.2d 1043, 1047 (5th Cir. 1990). This is an indemnity dispute; therefore, the indemnity provision of the MMCSC informs this determination. The MMCSC states that Grand Isle will "defend, indemnify, release and hold company's other contractors [e.g., Seacor] harmless . . . from and against all claims, liabilities, damages, and expenses" resulting from "all injuries to, deaths, or illnesses of persons in [the] contracted group." When a dispute arises under the indemnity provision, the underlying "injury" (or death or illness) becomes a contractual event which initiates contractual obligations under the indemnity agreement with Grand Isle. The location of the injury thus is critically

important in our determination of whether, under § 1333(a)(2)(A), state law may be substituted as surrogate federal law to govern the dispute.

In the instant matter, since the indemnity agreement does not provide a geographical nexus with the OCS, § 1333(a)(2)(A) cannot be used to apply state law to the dispute. Neil's "injury" occurred on a vessel sailing the high seas that was not connected to or in any way touching a platform or any other situs attached to the OCS. Without any geographical nexus to the OCS, the plain language of § 1333(a)(2)(A) prevents our application of Louisiana law, as surrogate federal law, to govern the adjudication of the dispute.

IV.

Supreme Court precedent, as well as our own OCSLA jurisprudence, confirms that situs is the pertinent inquiry in determining whether state law governs a particular dispute. An important early case, Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352 (1969), comprised two consolidated wrongful death cases, both of which involved accidents during the course of the decedents' work on offshore platforms. One worker was killed when a crane mounted on an artificial island collapsed and toppled onto a nearby barge; the deceased had been working on the crane at the time of the collapse. The other worker was killed when he fell from a derrick affixed to an artificial island while performing a test on a drill pipe. To determine whether § 1333(a)(2)(A) required application of state law as surrogate federal law over these wrongful death actions, the Supreme Court first noted that Congress's intent in enacting the statute "was to define a body of law applicable to the seabed, the subsoil, and the fixed structures such as those in question here on the outer Continental Shelf." Id. at 355. "This approach was deliberately taken in lieu of treating the structures as vessels, to which admiralty law supplemented by the law of the jurisdiction of the vessel's owner would apply." Id. Concluding that these

21

accidents occurred on "islands, albeit artificial ones," the Supreme Court found § 1333(a)(2)(A) required application of state law in both disputes. Id. at 360.

More recently, in Offshore Logistics v. Tallentire, 477 U.S. 207 (1986), two workers employed on drilling platforms off the coast of Louisiana were killed when a helicopter transporting them to shore crashed into the Gulf of Mexico. Their families filed wrongful death suits against the helicopter owner/operator under the Death on the High Seas Act (DOHSA), OCSLA, and Louisiana law. Among the questions that the Supreme Court faced was whether the families' DOHSA recovery could be supplemented by the remedies provided by state law through § 1333(a)(2)(A). In determining whether OCSLA's choice-of-law provision applied state law to the wrongful death disputes, the Supreme Court first looked to Congress's intent in enacting OCSLA, namely, "to treat the artificial islands covered by the Act as upland islands or as federal enclaves within a landlocked State, and not as vessels." Tallentire, 477 U.S. at 217. Maritime law, the controlling law on the high seas, was inapposite to disputes occurring on fixed platforms. Id. Federal law (or surrogate state law) was the appropriate choice of law governing disputes on artificial islands. Id. at 217-18.

The Supreme Court specifically rejected the argument that state law, via § 1333(a)(2)(A), should apply to these workers' wrongful death claims by virtue of their status as platform workers whose work occurred on OCS situses (artificial islands and fixed platforms). Id. at 218. Reasoning that "Congress determined that the general scope of OCSLA's coverage, like the operation of DOHSA's remedies, would be determined principally by locale, not by the status of the individual injured or killed," the Supreme Court looked to where the helicopter accident occurred to determine that the § 1333(a)(2)(A) requirements were not met and state law could not apply. Id. at 219. In Tallentire, the situs of injury was on the high seas, with no nexus to the OCS.

Consequently,§ 1333(a)(2)(A) did not require application of state law as surrogate federal law to adjudicate the dispute.

The seminal OCSLA choice-of-law case in this Circuit is Union Texas Petroleum Corp. v. PLT Engineering, 895 F.2d 1043 (5th Cir. 1990). In PLT, this court was asked to determine the applicable choice of law for a breach-of-contract dispute over PLT's failure to pay subcontractors who worked to install a subsea pipeline pursuant to PLT's contract with Union Texas. Id. at 1045-46. In reaching its conclusion, the court articulated three concerns))now deemed the three factors in the "PLT test"))to determine whether § 1333(a)(2)(A) permitted substitution of adjacent state law as surrogate federal law: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." Id. at 1047.

Nowhere in PLT did the court discuss a "focus-of-the-contract" test. Rather, the court first determined whether the "controversy" in dispute))namely, a controversy over the service contract))had a nexus with the geographical areas that statutorily comprise the OCS. To make this determination, the court examined the contract, under which "PLT was to design, fabricate, and install a gas transportation system from a platform owned by UTP, and its partners" off the Louisiana coast. Id. at 1045. Because construction of the gas system gathering line was the work for which PLT failed to tender payment, the court centered its situs inquiry on the location of the gathering line. The court found that "the gathering line exactly fits the statutory definition of an 'other device[] permanently or temporarily attached to the seabed . . . erected thereon for the purpose of . . . developing, or producing resources therefrom.'" Id. at 1047 (quoting 43 U.S.C. § 1333(a)(1)). Moreover,

23

the court found that "[t]he locations where the substantial work [constructing the gathering line] was done were covered situses))the subsoil or seabed; an artificial island; and an installation for the production of resources." Id. at 1047-48 (footnotes omitted). The court examined the location of "substantial work" performed on the pipeline because the dispute concerned PLT's failure to pay subcontractors who worked on that pipeline. Id. at 1047. There was no other analysis that could logically inform an OCSLA situs inquiry in that particular breach-of-contract dispute over payment for pipeline construction. This "substantial work" analysis resulted in the court's narrow holding that § 1333(a)(2)(A) "requires the application of Louisiana state law to non-maritime contract disputes arising from the construction of a gathering line on the seabed of the outer Continental Shelf." Id. at 1045.

A number of subsequent cases concerning indemnity disputes followed the three-part PLT test and concluded in each that Louisiana law would be given effect under § 1333(a)(2)(A) because the injuries occurred on the OCS. For example, in Smith v. Penrod Drilling Corp., 960 F.2d 456 (5th Cir. 1992), the underlying injury was sustained by a Penrod employee working on an offshore platform affixed to the OCS. The employee was standing on the platform, leaning on horizontal fencing around the platform, in order to reach equipment on an adjacent barge. The fencing collapsed and the worker fell. The court determined that the indemnity dispute occurred on the OCS, noting that "[d]rilling platforms constitute 'artificial islands' under section 1333(a)(1)." Id. at 459. Because the "controversy" had a nexus with the OCS, § 1333(a)(2)(A) required application of state law as surrogate federal law over the indemnity dispute.

Similarly, in Hollier v. Union Texas Petroleum Corp., 972 F.2d 662 (5th Cir. 1992), a platform worker slipped between the residential boat and the

platform on which he worked; he was crushed and subsequently drowned. This court noted that platforms are generally considered OCS situses and therefore found that the indemnity agreement had a geographical nexus with the OCS because "Hollier was in physical contact with the platform at the time of his injury." Id. at 665.

Likewise, Hodgen v. Forest Oil Corp., 87 F.3d 1512 (5th Cir. 1996), concerned an indemnity dispute over an injury sustained by a platform worker while transferring by swing rope from a fixed platform to a nearby vessel. The worker landed hard on the boat's dock, injuring his spinal cord. In undertaking its choice-of-law analysis, this court "[a]ssum[ed] . . . that Hollier and Smith state a rule in this circuit providing that the situs of the controversy in an OCSLA indemnity clause case is the location of the accident." Id. at 1527. The court found Hollier "established that when an injured worker is in contact with both a platform and a boat, the first factor of the PLT test is satisfied." Id. Because Hodgen was "in contact" with the platform via the swing rope when he sustained his injury on the vessel's deck, the court found an OCSLA situs present. Id. Therefore, "[a]ssuming that Hollier properly states the rule for the situs requirement in contractual cases"))namely, that the location of the accident is the correct situs to analyze for § 1333(a)(2)(A) purposes))OCSLA choice of law determined that Louisiana law would govern the indemnity dispute as surrogate federal law because the injury had a geographical nexus with the OCS. Id.

In this same vein, Dennis v. Bud's Boat Rental, Inc., 987 F. Supp. 948 (E.D. La. 1997), concerned an indemnity dispute over injuries to a worker transferred via personnel basket from a vessel on the high seas to a vessel moored to a work platform. "[T]he accident occurred on the deck of a vessel as plaintiff was in the act of transferring to another vessel, but while plaintiff was

25

in physical contact with a personnel basket attached to a crane on the platform." Id. at 950. Undertaking a PLT analysis pursuant to this court's decision in Hodgen, the court found a geographical nexus with the injury and the platform because the worker's personnel basket was attached to a crane affixed to the platform. Id.

The district court could have properly ended its situs inquiry there. It did not. Instead, it noted "a trend to find OCSLA situs where 'the work required by the contract was performed on an offshore platform' even if situs is not strictly, physically met." Id. (quoting Wagner v. McDermott, 899 F. Supp. 1551, 1556 (W.D. La. 1994)). Based on this "trend")) notably inapplicable to the facts of the case before it, which involved an injury sustained while in contact with a personnel basket on an OCS platform)) the Dennis court concluded that there was an OCSLA situs because the worker had "both physical and contractual connection with the platform." Id. In doing so, the Dennis court unnecessarily muddied the clear connection between physical injury and situs in our OCSLA jurisprudence.

Admittedly, as the Dennis court acknowledged, there is an alternative line of cases that emerged from PLT's application of a "substantial work" analysis to determine the situs for OCSLA choice-of-law purposes. For example, Wagner v. McDermott involved a worker who allegedly suffered injuries when he slipped and fell on the deck of a residential barge adjacent to, but not connected to or a part of, a platform. 899 F. Supp. at 1552. This injury precipitated an indemnity dispute between the barge owner and several third-party defendants. The McDermott court first considered the situs analysis under Hollier, a case that was directly analogous to the facts of the indemnity dispute before it. Applying Hollier's situs analysis, the court noted that the inquiry was "defined by where the plaintiff's accident occurred" and acknowledged that under this standard,

26

"the 'controversy' did not take place on an OCSLA situs." Id. at 1556. Accordingly, state law would not apply under § 1333(a)(2)(A).

Notwithstanding this conclusion, the McDermott court then purported to apply the three factors of the PLT test to arrive at a different outcome. It focused on the PLT court's discussion of the "substantial work" situs inquiry: "[T]he situs requirement could [also] be met when 'the locations where the substantial work pursuant to the contract was done were covered situses.'" Id. Ignoring that PLT discussed this "substantial work" inquiry in the context of a service contract dispute over payment for subsea pipeline work, not a dispute about an injury for which indemnification was sought)) and contrary to Tallentire's admonishment that Congress meant for situs to be determined by the locale of the controversy and not by the status of the employee)) the district court found the "substantial work" inquiry dispositive. The district court determined that the situs of the indemnity dispute was the OCS, "as the work required by the contract was performed on an offshore platform." Id. Consequently, the district court found Louisiana law applied as surrogate federal law to the indemnity dispute.[2]

These two lines of OCSLA situs inquiry in indemnity disputes emerging from PLT are clearly in conflict with each other. The jurisprudence is admittedly muddled and in need of a clear resolution. Unfortunately, the resolution now proposed by the majority does not follow the statutory requirements of § 1333(a)(2)(A).

---

[2]   This court affirmed this decision solely on its analysis of whether maritime law applied and not with respect to the situs inquiry. See Wagner v. McDermott, Inc., 79 F.3d 20, 22 (5th Cir. 1996) (adopting the district judge's "holding that the contract is non-maritime in nature" and "assum[ing] without deciding that [] OCSLA applies").

V.

Today, the majority proposes a new rule to evaluate what it believes the OCSLA situs is, in a contractual dispute. Under this rule, "the focus-of-the-contract test is the appropriate test to apply in determining the situs of the controversy in contract cases, and we adopt that rule for the circuit." Op. at 2. The "focus-of-the-contract" test would require us to look to where the contract contemplates that a majority of the work is to be performed. Id. The majority bases its holding on PLT's breach-of-contract situs inquiry, examining "where the substantial work was done." Id. at 12. Therefore, according to the majority, "a contractual indemnity claim (or any other contractual dispute) arises on an OCSLA situs if a majority of the performance called for under the contract is to be performed on stationary platforms or other OCSLA situses enumerated in 43 U.S.C. § 1333(a)(2)(A)." Id. at 13. Significantly, the majority distinguishes this test from the OCSLA situs inquiry in tort cases, which would look simply to where the tort occurred to determine if § 1333(a)(2)(A) requires application of state law. Id. at 2.

However, there is no distinction between tort and contract in OCSLA's choice-of-law provision. The majority states that "[o]ur case law . . . requires us to distinguish between a contractual indemnity claim and the underlying incident." Id. at 11. But nowhere in Rodrigue, Tallentire, or any of our OCSLA jurisprudence does case law support or demand that we consider the situs of an indemnity claim to be something other than where the underlying incident occurred, and there is no justification for doing so now.[3] Section 1333(a)(2)(A)'s

---

[3] Notably, this statement about "our case law" requiring a tort-contract distinction in applying OCSLA's choice-of-law provision comes after a lengthy discussion of Hollier, Smith, and Hodgen, indemnity cases in which this court adopted the location of the underlying injury as the relevant situs for its § 1333(a)(2)(A) inquiry. Sumrall v. Ensco Offshore Co., 291 F.3d 316 (5th Cir. 2002), cited by the majority to support its sweeping claim about our OCSLA jurisprudence, is not an OCSLA case. It has no bearing on the extent to which OCSLA extends

language plainly does not invite an inquiry into a contract's "focus" when determining whether a dispute occurs on the OCS. The majority takes pains to distinguish controlling Supreme Court OCSLA precedent in Rodrigue and Tallentire on the grounds that these were tort disputes rather than contractual disputes, and therefore the situs of the tort determined the OCSLA situs. However, nothing in either case calls for the distinction between tort and contract that the majority presently proffers. Rather, the focus has always been on the situs of the controversy.

As discussed above, Rodrigue concerned two consolidated wrongful death actions on stationary platforms attached to the OCS. Since these platforms were situses clearly delineated as part of the OCS under § 1333(a)(2)(A) ("artificial islands and fixed structures erected thereon"), the Supreme Court found that the "injuries" occurred on the OCS. Rodrigue v. Aetna Cas. & Sur. Co., 395 U.S. 352, 360 (1969). Conversely, in Tallentire, the Supreme Court determined that § 1333(a)(2)(A) did not extend state law to platform workers killed in a helicopter crash while in transit over the high seas because "[b]y its terms, OCSLA must be 'construed in such a manner that the character of the waters above the outer Continental Shelf as high seas . . . shall not be affected.'" Offshore Logistics v. Tallentire, 477 U.S. 207, 217 (1986) (quoting 43 U.S.C. § 1332(2)).

Notably, in Tallentire, the Supreme Court rejected the argument that § 1333(a)(2)(A) required application of state law to the cause of action because the decedents were platform workers. Id. at 218. The Supreme Court stated:

---

state law to actions sounding in tort versus contract, and indeed, does not implicate OCSLA at all. Sumrall noted that an earlier case's indemnification dispute was "contractual in nature," thereby distinguishing that from the underlying injury dispute at bar, which sounded in tort. Id. at 319. However, this distinction does not support the majority's present decision to parse out tort and contract disputes for § 1333(a)(2)(A) purposes. Sumrall concerned an interpretation of the breadth of an indemnity clause and did not impute OCSLA's choice-of-law provision in any way.

The extension of OCSLA far beyond its intended locale to the accident in this case simply cannot be reconciled with either the narrowly circumscribed area defined by the statute or the statutory prescription that the Act not be construed to affect the high seas which cover the Continental Shelf . . . .

The character of the decedents as platform workers who have a special relationship with the shore community simply has no special relevance to the resolution of the question of the application of OCSLA to this case.

Id. at 218-19 (emphases added).

The Supreme Court pinpointed § 1333(a)(2)(A)'s delineated geographical area)) "that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon")) to determine that a nexus between the situs of the injury and the OCS is required for OCSLA's choice-of-law provision to apply. The Supreme Court noted that Congress intended for the proper situs inquiry under § 1333(a)(2)(A) to turn on the location of the incident giving rise to the claim, not on the status of the individual as a platform worker. Id. at 219. The Supreme Court found "no special relevance" in the work the platform workers performed, or even the work contemplated by the contract under which the workers were employed, in determining the actual "situs" of the dispute. Instead, the Supreme Court found OCSLA's choice-of-law provision inapplicable because the location of the injury simply had no geographic nexus with the OCS.

The majority today nevertheless promotes a "focus-of-the-contract" test that regrettably employs the same status-based analysis that the Tallentire court specifically rejected. The work order on which the majority would have us "focus" has no connection whatsoever to the injury precipitating the instant dispute. Neil was not at work at the time of his injury. In evaluating where a work order contemplates the majority of the work will be performed, the

majority is relying on the status of the workers performing under that work order to determine the OCSLA situs. Such analysis finds no support in Tallentire. Section 1333(a)(2)(A)'s situs inquiry is location-based, and if the triggering incident occurs off of the OCS, Tallentire requires that our OCSLA choice-of-law inquiry end there.[4] In the instant matter, the triggering incident occurred on board the SEA HORSE IV, which was close to, but not touching, Neil's residential platform, a fact neither party disputes. This "injury" situs has no physical nexus with the OCS; therefore, OCSLA's choice-of-law provision does not apply.

## VI.

The issue of whether LOIA applies as surrogate federal law under OCSLA clearly implicates this court's decision in PLT, which sets forth this Circuit's controlling OCSLA choice-of-law three-prong test. As discussed above, the relevant inquiry for the purposes of this appeal is PLT's first prong, or whether "[t]he controversy . . . arise[s] on a situs covered by OCSLA." Union Tex. Petroleum Corp. v. PLT Eng'g, 895 F.2d 1043, 1047 (5th Cir. 1990). Significantly, the first prong of PLT requires a determination of where the controversy arose, not where the work is done. If we find that there is no OCSLA situs))that is, no nexus between the controversy and the OCS))our inquiry ends at PLT step one.

The facts of PLT itself required a different inquiry from our present case only because PLT involved a service contract. PLT was not an indemnity case; no underlying injury was involved. Rather, as the majority describes it, PLT was "a pure contract case to collect unpaid invoices for the installment of a

---

[4] We agree with the majority that proper OCSLA choice-of-law analysis requires an inquiry into three areas: 1) the situs of the controversy; 2) whether federal maritime law applies of its own force; and 3) whether state law conflicts with federal law. See PLT, 895 F.2d at 1047.

subsea pipeline and to impose a statutory lien on the pipeline under Louisiana law." Op. at 8-9. The PLT court's choice-of-law analysis was necessarily informed by where the work on the subsea line was performed because payment for that work was the central dispute. No other location logically comprises the situs of the "controversy" over breach of payment for pipeline construction.

We simply do not have those facts before us in the instant indemnity matter. Neil was off duty as a platform worker when he was injured while being ferried to his residential platform. The location of his injury is not in dispute: he was on board the SEA HORSE IV. Therefore, we need look no further than the where the SEA HORSE IV was at the time of Neil's injury to complete our situs inquiry. The parties do not contest that this vessel was on the high seas and not in contact with an OCSLA situs. Consequently, § 1333(a)(2)(A) does not permit Louisiana law, as surrogate federal law, to govern the adjudication of this dispute.

Moreover, the majority's holding improperly collapses PLT's step one inquiry (situs) into step two (whether federal maritime law applies of its own force) to form a singular test based solely on the "focus" of the dispute. We can properly consider the "nature" of the MMCSC in our § 1333(a)(2)(A) inquiry, but only in the analysis of PLT step two, to determine whether federal maritime law governs.

Davis & Sons v. Gulf Oil Corp., 919 F.2d 313, 315-17 (5th Cir. 1990), elucidates the proper test for determining whether a contract is maritime or non-maritime, a pertinent inquiry to the second prong of the PLT test: whether federal maritime law applies to the contract of its own force. Notably, Davis states that "[w]hether the blanket agreement and work orders, read together, do or do not constitute a maritime contract depends, as does the characterization of any other contract, on the nature and character of the contract, rather than

32

on its place of execution or performance." Id. at 316 (internal quotation marks and citation omitted). To determine the "nature and character of the contract," Davis analyzed six factors:

> 1) [W]hat does the specific work order in effect at the time of injury provide? 2) [W]hat work did the crew assigned under the work order actually do? 3) [W]as the crew assigned to work aboard a vessel in navigable waters; 4) [T]o what extent did the work being done relate to the mission of that vessel? 5) [W]hat was the principal work of the injured worker? and 6) [W]hat work was the injured worker actually doing at the time of injury?

Id.

These factors entail an inquiry into where the majority of a contract's work was performed) ) in essence, a "focus-of-the-contract" inquiry, the very test the majority now proposes to determine whether a contract dispute occurs on an OCS situs. An evaluation of where a contract contemplates work will be performed necessitates an analysis of specific work orders, crew assignments, and whether these assignments relate to the mission of the vessel on which the injury occurred. Indeed, in determining whether Neil's injury occurred on an OCS situs, the district court relied on these very factors:

> At the time of the accident, Neil's work for the day was complete, and he was proceeding to the living quarters platform. Neil's work, which consisted mainly of platform repairs and grating repairs, was performed on platforms, not vessels. Neil's sole relationship to the vessel was as a passenger; he did not contribute to the mission of the vessel in any manner. Further, the work tickets from April 7, 2005 to May 7, 2005 demonstrate that the work performed pursuant to the MMCSC was performed on platforms, not on vessels.

Grand Isle Shipyard, Inc. v. Seacor Marine, LLC, No. 06-1405, 2007 U.S. Dist. LEXIS 71674, at *9 (E.D. La. Sept. 26, 2007).

Thus, to determine whether "substantial work" under the MMCSC was performed on OCS situses, the district court looked to specific work orders in

effect at the time of Neil's injury, the work Neil was assigned to do, the extent Neil's work related to the mission of the SEA HORSE IV, Neil's principal work, and what work (if any) Neil was doing at the time of the accident. That is, the district court employed a Davis inquiry, to determine not whether federal maritime law applies of its own force to a contract, but rather to come to the conclusion that Neil was injured on an OCS situs. The majority now adopts the district court's misplaced Davis-factor OCSLA situs analysis and "agree[s] with the district court that the indemnity dispute in this case arose on an OCSLA situs because it is uncontested that a majority, if not all, of the work called for under the contract [MMCSC] was to be performed on stationary platforms on the OCS." Op. at 13. The majority reaches this conclusion notwithstanding that the injury that is the basis of the indemnification action is wholly unrelated to any work being performed under the MMCSC.

However, if we examine the "nature and character of the contract" at both PLT step one (situs) and step two (whether federal maritime law applies), then we erase the distinction between the two inquiries required by both the statute and PLT. Indeed, neither Davis nor any of our controlling OCSLA precedent demands a "focus-of-the-contract" analysis for § 1333(a)(2)(A)'s situs inquiry. Given that, the majority's new test is at best redundant, at worst irrelevant.

We must take care not to collapse these two distinct prongs of inquiry. In Hodgen, this court declined to "short-circuit" the situs inquiry by solely analyzing the dispute's "focus" in determining whether OCSLA's choice-of-law provision applied. Hodgen v. Forest Oil Corp., 87 F.3d 1512, 1525 (5th Cir. 1996) (specifically rejecting the assertion that "the only inquiry relevant to the choice of law in matters arising out of oil exploration activities on the Outer Continental Shelf was the status of the contract as maritime or non-maritime," referring to reasoning in Domingue v. Ocean Drilling & Exploration Co., 923 F.2d 393 (5th

34

Cir. 1991)). Instead, Hodgen held that "[t]he proper test for deciding whether state law provides the rule of decision in an OCSLA case remains the three-part PLT test." Id. at 1526. As both § 1333(a)(2)(A) and the PLT test demand, this court must separate its inquiry and evaluate situs and contract status independently.

It cannot be overstated that the work contemplated by the MMCSC in the instant matter is factually and legally irrelevant to the indemnity provision; the incident (injury, death, or illness) triggers the indemnity provision. That is, there is no need to analyze where the "focus of the contract" takes place, i.e., "where the contract contemplates that most of the work will be performed," when a discrete incident) ) the underlying injury) ) precipitates an indemnity dispute. The "work" simply has no connection to a determination of whether an indemnity dispute arises on the OCS because the "work" did not trigger the dispute. What is factually and legally relevant to the indemnity provision is the "injury" to an employee covered under the MMCSC. This injury triggers the dispute. Therefore, if the underlying injury did not occur on any structure affixed to the OCS, there is no OCS situs, and Louisiana law does not apply. In this case, the indemnity provision could apply anywhere because the injury, death or illness could occur anywhere. It so happened that the incident occurred away from any recognized OCS situs.

## VII.

The majority's "focus-of-the-contract" test, "look[ing] to where the contract contemplates that most of the work will be performed," disregards Tallentire's interpretation of § 1333(a)(2)(A), which classifies situs "principally by locale," not by the "character" of the work under the contract. Offshore Logistics v. Tallentire, 477 U.S. 207, 219 (1986). The test purports to provide "predictability and stability" in determining how OCSLA's choice-of-law provision applies to

indemnity contracts. However, the proposed test creates predictability only by equating the "controversy" with "majority of the work," even though the work performed under the contract does not inform the situs of an indemnity dispute. Tautologically, by assuming the "majority of the work" is the definitive situs test for choice of law in a contract dispute, the "choice of law" is determined by the test, rather than by the statute.

Additionally, the majority fails to provide guidance for application of its "focus-of-the-contract" test to future cases with different factual situations. Apparently the "contract" (among the many contracts involved in this dispute) that we are meant to be analyzing is a work order rather than the MMCSC itself, as the opinion indicates in a footnote ("Unless a contrary intent is reflected by the master contract and the work order, in determining situs in a contract case such as this, courts should ordinarily look to the location where the work is to be performed pursuant to the specific work order rather than the long term blanket contract." Id. at 12 n.6). But the opinion fails to address the potential challenges in this test's application. Without any specifics, what comes off as a precise test on the pages of our reporter is, in fact, an amorphous term for lower courts and litigants to grapple with in future cases. Whose work order(s) are we analyzing: Seacor's, as the party seeking indemnity, or Grand Isle's, as the employer of the injured party?

Moreover, what do we mean by "majority"? Majority of hours worked? The majority proportion of work designated by the contract? Should we factor in the number of employees involved to make our determination? Is the "majority" of the work prospective or retrospective in application, or some combination thereof?

The majority proffers this "majority of the work" standard without sufficient substantiation for how it is to be applied, let alone why we are to be looking to work at all, when the "work" does not inform an indemnity dispute

triggered by a discrete act (the underlying injury). At the very least, looking to the location of the injury for determining OCSLA situs in indemnity disputes is more precise given that an injury is a discrete event occurring in a specific location, and is the contractually anticipated event that triggers application of the indemnity provision in the first place. More importantly, this is also the situs test articulated by the Supreme Court in Rodrigue and Tallentire.

The majority fails to acknowledge that when a dispute arises under the indemnity provision, the underlying "injury" (or death or illness) is no longer merely a tort. The "injury" becomes a contractual event as the act pursuant to which a contractor may seek indemnification. The work contemplated by the MMCSC in the instant matter is factually and legally irrelevant to the indemnity dispute. Indeed, if the majority correctly applied their test and truly examined the "focus-of-the-contract" at issue, they would focus on the indemnity agreement, not a work order.

The majority's attempt to harmonize our OCSLA jurisprudence with a predictable new rule accomplishes neither harmony nor predictability, and comes at the expense of a proper interpretation of § 1333(a)(2)(A)'s situs requirement. The statute outlines how we are to apply it, and we would be remiss to read more into it than that.

Accordingly, I dissent.

PRISCILLA R. OWEN, Circuit Judge, dissenting.

Our court has considered this case en banc in an effort to bring at least some uniformity and predictability to the law in this Circuit regarding the applicability of the Outer Continental Shelf Lands Act (OCSLA)[1] to contractual indemnity provisions. That is a laudable and responsible undertaking, given the confusion in our jurisprudence in this area. I respectfully submit, however, that the test the court adopts today sweeps too broadly. Nor does the "majority-of-the-work" test find support in the express provisions of OCSLA, state law applied as federal law, or federal common law.

This case presents a difficult question: what law governs an indemnity provision in a contract when the act or omission that gave rise to the underlying tort claim occurred on navigable water on the Outer Continental Shelf (OCS), but the indemnity obligation is contained in a contract that primarily calls for work to be performed on stationary platforms on the OCS, although it also contemplates activities on navigable waters? It is not clear from OCSLA, at least to me, what law Congress intended to govern contractual obligations under these circumstances. A number of arguments can be made, as will be considered below, regarding the correct tack to take.

The court has today fashioned a choice-of-law mechanism that turns on where the majority of the work is to be performed. While I agree that choice-of-law principles must apply under OCSLA with regard to contracts to which more than one body of substantive law might apply, I would apply either federal common law choice-of-law principles or Louisiana's choice-of-law code provisions. The Supreme Court asked and left unanswered questions in Gulf Offshore Co. v. Mobil Oil Corp.[2] as to whether federal common law or a state's law should be applied as federal law under OCSLA if there is a conflict between the federal law

---

[1] 43 U.S.C. §§ 1331 et seq.

[2] 453 U.S. 473, 487-88 (1981).

and state law. Because the parties have not addressed the issues that pertain to such an analysis, I would remand to the district court for further proceedings.

I

The facts in this case are somewhat complicated because several contracts are involved, and Seacor is seeking indemnity from Grand Isle pursuant to a provision in a contract between Grand Isle and BP American Production Company. Seacor is not a party to that contract but is an express third-party beneficiary.

Grand Isle agreed with BP to indemnify each of BP's other contractors, such as Seacor, from claims made by Grand Isle employees if the contractor seeking indemnity had executed an agreement with BP extending reciprocal indemnity to Grand Isle. The master service agreement between Grand Isle and BP, in which the indemnity provision at issue is found, provides that BP contractors are third-party beneficiaries of this indemnity agreement. Similar indemnity provisions are contained in Seacor's Vessel Charter Contract with BP.

The BP/Grand Isle agreement contemplates that Grand Isle employees will perform work on fixed platforms in the Gulf of Mexico, but it also expressly provides that BP will furnish transportation for Grand Isle employees from the shore to the platforms[3] and room and board offshore.[4] Accordingly, the BP/Grand Isle contract acknowledges that activities undertaken in furtherance of the contract will occur both on navigable waters as well as on the offshore platforms.

---

[3] Article 2.04 provides: "Unless otherwise agreed in writing, Company [BP] shall furnish, at its cost and expense, transportation for Contractor's [Grand Isle's] personnel, equipment, and materials between Company's [BP's] designated shorebase or heliport and the offshore Work location."

[4] Article 2.06 provides: "Company [BP] shall provide room and board at the offshore Work location for Contractor's [Grand Isle's] personnel performing services under this Contract."

A Grand Isle employee was injured on Seacor's vessel while in transit between an offshore platform used for living quarters and the offshore platform on which he had been working. The employee recovered from Seacor, and Seacor seeks indemnity from Grand Isle.

While third-party beneficiary indemnity agreements may not obtain in every or even most agreements pertaining to work on offshore platforms on the OCS, it would seem that many OCS-related contracts will contemplate that activities undertaken in furtherance of the contract will occur not only on offshore platforms, but on or over navigable waters because the workers will necessarily have to traverse the OCS to reach offshore platforms. There are at least two bodies of law that could arguably apply to indemnity provisions in such contracts: general maritime law[5] or the law of the adjacent state applied as federal law. It is also possible that a contract could call for work on multiple platforms, some of which are offshore one state and others offshore another. This increases the potential sources of law that might be applied to indemnity provisions. The court's decision today reaches all such contracts.

It is also conceivable that a single contract could provide for work onshore, in states that are not adjacent to the OCS, as well as work on the OCS. The court's decision appears to reach contracts in which only a small percentage of the work to be performed occurs offshore.

Another notable result of the court's test is that it gives no effect to contractual choice-of-law provisions. The majority-of-the-work test is the only factor to be considered if the contract is not a maritime contract and applicable state law is not inconsistent with federal law.

---

[5] See Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 218-19 (1986) (holding that admiralty jurisdiction was properly invoked in a suit by survivors of offshore workers who perished in a helicopter crash while being transported from an offshore platform to shore).

In the present case, the master service agreement between BP and Grand Isle provides that

> whenever performance of this contract is in any way related to maritime activity, the general maritime laws of the United States shall govern the validity, construction, interpretation, and effect of this contract, excluding any choice of the law rules which would otherwise require the application of laws of any other jurisdiction.

Grand Isle and BP agreed that

> [i]n the event maritime law is held to be inapplicable by a court of competent jurisdiction, the laws of the state of Oklahoma shall apply, unless (i) otherwise provided in this contract or (ii) application of such law to a particular provision would prevent enforcement of such provision, in which case the law applicable to such provision shall be any potentially applicable law that would allow enforcement of said provision as written.

The majority-of-the-work test means that choice-of-law provisions will be ignored in a contract that covers activities in more than one area of the OCS as well as related activities on the high seas. For example, a contract may encompass work on a platform offshore Louisiana and work on another platform offshore Texas, and the parties may specify that Texas law will govern all issues. Applying the court's test, if a majority, even a slim majority, of the work is to be performed in Louisiana, then Louisiana law will govern all aspects of the contract as federal law. An injury to a worker that occurred on a platform offshore Texas may give rise to a contractual claim for indemnity, but the indemnity claim will be governed by substantive Louisiana law as federal law even though (1) the parties agreed Texas law would apply, (2) the injury occurred in an area offshore Texas and Texas law will govern any personal injury claims as federal law, and (3) Louisiana state courts applying Louisiana law might not give effect to the

Louisiana Offshore Indemnity Act (or LOIA)[6] under similar facts that did not concern the OCS.[7] Outside the indemnity area, routine breach-of-contract issues, such as whether a breach occurred, whether the breach was material, and the types of damages available, would be governed by Louisiana law as federal law even though the parties agreed that Texas law would apply to the contract and substantial work occurred offshore Texas.

The majority-of-the-work test appears to apply to all contractual obligations, even though generally accepted choice-of-law principles recognize that differing law may apply to differing provisions of a contract.[8] The majority-

---

[6] LA. REV. STAT. ANN. § 9:2780(A).

[7] See, e.g., King v. I.E. Miller of Eunice, Inc., 07-167, p. 6 (La. App. 3 Cir. 11/21/07); 970 So. 2d 703, 707.

[8] See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. d ("Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states."); see also LA. CIV. CODE ANN. art. 3515 cmt. d, which provides:

(d) Issue-by-issue analysis and dépeçage. The use of the term "issue" in the first paragraph of this Article is intended to focus the choice-of-law-process on the particular issue as to which there exists an actual conflict of laws. When a conflict exists with regard to only one issue, the court should focus on the factual contacts and policies that are pertinent to that issue. When a conflict exists with regard to more than one issue, each issue should be analyzed separately, since each may implicate different states, or may bring into play different policies of these states. Seen from another angle, each state having factual contacts with a given multi-state case may not have an equally strong interest in regulating all issues in the case, but only those issues that actually implicate its policies in a significant way.

This so-called issue-by-issue analysis is an integral feature of all modern American choice-of-law methodologies and facilitates a more nuanced and individualized resolution of conflicts problems. One result of this analysis might be that the laws of different states may be applied to different issues in the same dispute. This phenomenon is known in conflicts literature by its French name of dépeçage. Although infrequently referred to by this name, this phenomenon is now a common occurrence in the United States and has received official recognition in Europe. This Article does not prohibit dépeçage. However, dépeçage should not be pursued for its own sake. The unnecessary splitting of

42

of-the-work test selects the substantive law of a single state (excluding choice-of-law principles) to serve as borrowed federal law for all contractual issues.

The court does not explain how the majority-of-the-work test will affect contractual claims that relate to property. Will contractual rights and substantive law regarding structures or pipelines attached to the seabed on the OCS be governed by one state's law even though the structures or pipelines are found across a broad expanse of the OCS, some in areas adjacent to Texas, others in areas adjacent to Louisiana, Mississippi, or Alabama?

The proper application of OCSLA presents difficult questions, but I submit that Congress, in enacting OCSLA, did not intend to jettison well-recognized principles that determine what law will govern particular contractual provisions. Congress's goal in enacting OCSLA was to "provide a comprehensive and familiar body of law."[9]

## II

The starting point in determining what OCSLA requires is the Act itself. Section 1333(a)(1) provides that:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting

---

the case should be avoided, especially when it results in distorting the policies of the involved states.

[9] Chevron Oil Co. v. Huson, 404 U.S. 97, 103 (1971), overruled in part on other grounds by Harper v. Va. Dep't of Taxation, 509 U.S. 86 (1993).

such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . .[10]

As the Supreme Court has stated, "OCSLA declares the Outer Continental Shelf to be an area of exclusive federal jurisdiction."[11]  OCSLA further provides that

> [t]o the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .[12]

It is this provision of OCSLA that directs courts to apply federal law to the subsoil and seabed of, and artificial islands and fixed structures on, the OCS, but to borrow "applicable and not inconsistent" state law.  OCSLA does not expressly mention contracts that pertain to such artificial islands and structures.

There are a number of possible interpretations of OCSLA's applicability to contracts.  The first question that must be answered is whether Congress intended the extended geographic boundaries of adjacent states to determine what law applies to any contractual provision touching a structure within a particular state's extended boundaries, without regard to choice-of-law principles.  Notably, the court's opinion does not conclude that geographic boundaries are

---

[10] 43 U.S.C. § 1333(a)(1).

[11] Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 479 (1981) (internal quotation marks omitted).

[12] 43 U.S.C. § 1333(a)(2)(A).

determinative. Under the majority-of-the-work test, a single state's law will be selected even if the contract pertains to work in more than one state's adjacent area. The court has employed a choice-of-law test, but not one derived from "the normal choice-of-law rules that the forum would apply."[13]

However, if the geographic boundary is determinative, then the question remains, do courts look to the geographic location of the underlying occurrence that gives rise to the contractual dispute, or should the contract's relationship to a geographic area be considered instead? If the contract is considered, there are numerous possibilities, from a geographic perspective. Should courts look to the area in which the contract contemplates that some, a substantial amount, or a majority of the work has been performed? Alternatively, should the question be where the work will be performed over the life of the contract? Should courts instead consider the location of the work the injured party had been performing or was about to perform? Should we look to which fixed structure the worker was en route in furtherance of the contract, or leaving, when injured? Judge Garza's dissenting opinion concludes that the geographic location of the underlying injury giving rise to the contractual dispute is determinative. This test is appealing because it is easily applied. I am not persuaded, however, that the text of OCSLA supports it.

The concept that we consider only geography and not choice-of-law principles when the OCS is involved is derived directly from decisions of the Supreme Court. The Court has construed OCSLA and said in Chevron Oil Co. v. Huson that "[s]ince the federal court is not, then, applying the law of another forum in the usual sense, ordinary conflict of laws principles have no relevance."[14] The Supreme Court subsequently cited this statement in support of its conclusion

---

[13] Gulf Offshore Co., 453 U.S. at 482 n.8.

[14] 404 U.S. at 102-03.

in a footnote in Gulf Offshore Co. v. Mobil Oil Corp. that "OCSLA does supersede the normal choice-of-law rules that the forum would apply."[15]

The Court's statements regarding choice of law must be considered in context. Both cases involved primarily tort (personal injury) actions.[16] The Court was not called upon to consider whether choice-of-law principles have "no relevance" in contract actions.

The Supreme Court's actual holding in Chevron Oil Co. v. Huson was that Louisiana's statute of limitations governed an injured worker's suit for personal injuries.[17] State law was applied as federal law, and accordingly, the Court reasoned that "[s]ince the federal court is not, then, applying the law of another forum in the usual sense, ordinary conflict of laws principles have no relevance. [The Louisiana statute of limitations] is 'applicable' in federal court under the Lands Act just as it would be applicable in a Louisiana court."[18] This is far from an all-encompassing rejection of choice-of-law principles that pertain to contracts.

In Gulf Offshore Co. v. Mobil Oil Corp., Mobil had sued Gulf for contractual indemnity after a Gulf employee was injured on a vessel chartered by Mobil.[19] The question actually decided in that case was whether federal courts have exclusive jurisdiction over personal injury and indemnity claims arising under OCSLA.[20] The injury occurred offshore Louisiana, and there was no argument before the Court that another adjacent state's law applied or that general

---

[15] 453 U.S. at 482 n.8; see also id. at 486 ("The statute thus contains an explicit choice-of-law provision.").

[16] See id. at 480-85; Chevron Oil Co., 404 U.S. at 98.

[17] 404 U.S. at 102-03.

[18] Id.

[19] 453 U.S. at 476 & n.1.

[20] Id. at 475.

maritime law applied either to the personal injury claim or the contractual indemnity provision. The Supreme Court simply observed that Louisiana law applied as federal law under OCSLA to the personal injury action.[21] Indeed, there was only scant mention of the contractual indemnity provision. Nor was any contention made in Gulf Offshore that the indemnity provision was unenforceable under Louisiana's Oilfield Indemnity Act, because the injury in that case occurred in 1975, before the Louisiana law was enacted in 1981.[22] The Supreme Court did not hold that courts are foreclosed from applying an adjacent state's choice-of-law principles when the adjacent state would consult its choice-of-law rules in deciding whether a statutory provision should be applied to render a contractual indemnity provision unenforceable.

It is unquestionably our obligation to apply the Supreme Court's precedent faithfully. That does not mean that we should unquestioningly assume that the Court's statements in one context are binding precedent in other, demonstrably different, contexts. I respectfully submit that we should not consider the Supreme Court's conclusion that choice-of-law principles do not apply to tort actions as a binding determination that resort cannot be had to choice-of-law principles in order to determine what substantive law governs a contract. In other areas of the law, the Supreme Court has recognized that different concepts apply in deciding what law governs a contract as distinguished from a tort.[23] For

---

[21] Id. at 481. The Supreme Court subsequently noted in Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 219 (1986), that "no question was even raised in Gulf Offshore regarding whether OCSLA applied to an accident aboard a vessel adjacent to the platform." See also id. at 219 ("[T]he facts of [Gulf Offshore and Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352 (1969)] make clear that OCSLA was presumed applicable not because of the status of the decedents but because of the proximity of the workers' accidents to the platforms and the fact that the fatalities were intimately connected with the decedents' work on the platforms.").

[22] 1981 La. Acts, No. 427.

[23] Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 23 (2004).

example, the Supreme Court has said that in determining whether a contract is a maritime contract, "[t]he boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw."[24] The Court explained, "To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case."[25] "Nor can we simply look to the place of the contract's formation or performance."[26] In discussing the seminal decision of Kossick v. United Fruit Co.,[27] the Court said, "It did not matter that the site of the inadequate treatment—which gave rise to the contract dispute—was in a hospital on land."[28] Rather, whether the contract was a maritime contract turned on considerations divorced from the location of the treatment that the shipowner promised to provide to the injured seaman.[29]

It would seem that some choice-of-law rules must be applied to determine whether a contract is governed by OCSLA and if so, which adjacent state's law is borrowed as federal law, to the extent it is not in conflict with federal law.

## III

If Congress did not intend in OCSLA to foreclose consultation of choice-of-law principles that apply to contracts, then the next question that must be

---

[24] Id. (internal citation and quotation marks omitted).

[25] Id.

[26] Id. at 24.

[27] 365 U.S. 731 (1961).

[28] Norfolk S. Ry. Co., 543 U.S. at 25.

[29] See id. at 24-25.

answered is what choice-of-law principles should govern. The possible choices include federal common law choice-of-law principles applicable to contracts, the application of the "adjacent state's" choice-of-law principles, or the application of the forum state's choice-of-law principles.

The Supreme Court has left open whether state law applied as federal law under OCSLA or federal common law prevails when the result would differ depending on which body of law applied. In Gulf Offshore Co. v. Mobil Oil Corp., one issue was whether, in an OCSLA case, the jury must be instructed that damages for lost future wages are not subject to federal income taxation.[30] The Court explained that "[o]ur first task is to determine the source of law that will govern."[31] To do so, "a court must consider the content of both potentially applicable federal and state law."[32] The Court observed that under federal common law, a defendant was entitled to such an instruction in an Federal Employers' Liability Act case.[33] The Court concluded that "[i]f Congress had been silent about the source of federal law in an OCSLA personal injury case, Liepelt would require that the instruction be given."[34] "But Congress was not silent," the Court noted,[35] and it remanded the case to state court "for a determination of whether Louisiana law requires the instruction and, if it does not, whether

---

[30] 453 U.S. 473, 485 (1981).

[31] Id.

[32] Id. at 486.

[33] Id. (citing Norfolk & W. Ry. Co. v. Liepelt, 444 U.S. 490, 498 (1980)).

[34] Id. at 487.

[35] Id.

Liepelt displaces the state rule in an OCSLA case."[36]  Its reasoning for doing so was as follows:

> [Congress] incorporated for this case the applicable law of Louisiana, but only "[t]o the extent [it is] not inconsistent" with federal law.  The statute does not distinguish between federal statutory and judge-made law.  It would seem then that if Louisiana law is "inconsistent," Liepelt controls.  Doubt arises, however, because in OCSLA Congress borrowed a remedy provided by state law and thereby "specifically rejected national uniformity" as a paramount goal.  Chevron Oil v. Huson, 404 U.S., at 104, 92 S.Ct., at 354.  In Chevron, we held that Louisiana rather than federal common law provided the federal statute of limitations for personal injury damages actions under OCSLA.  We recognized that "Congress made clear provision for filling the 'gaps' in federal law; it did not intend that federal courts fill those 'gaps' themselves by creating new federal common law."  Id., at 104-105, 92 S.Ct., at 354.  In this case, we face an analogous question: does the incorporation of state law preclude a court from finding that state law is "inconsistent" with a federal common-law rule generally applicable to federal damages actions?
>
> We need answer this question only if Louisiana law would not require that the instruction be given upon timely request.[37]

It would therefore seem necessary to determine if there is federal common law generally applicable to determine what law governs contracts.  If so, is that law inconsistent with Louisiana law, and if there is a conflict, does federal common law displace Louisiana law in an OCSLA case?  In this regard, I note only that circuit courts have concluded that a federal common law choice-of-law

---

[36] Id. at 488.

[37] Id. at 487-88.

analysis should be conducted when the issue is a federal question,[38] and that in the absence of guidance from Congress, courts have relied upon the Restatement (Second) of Conflicts of the Law for the content of federal common law.[39]

In the present case, Louisiana is unquestionably the adjacent state. But in other fact patterns, determining the "adjacent state" for purposes of deciding what law governs a contractual provision presents many of the same conundrums faced when attempting to apply geographic boundaries.

With regard to Louisiana law, at least one relatively recent intermediate appellate court decision indicates that Louisiana courts would first consult applicable choice-of-law Louisiana code provisions before deciding if Louisiana's Oilfield Indemnity Act eviscerates a contractual indemnity agreement. In King v. I.E. Miller of Eunice, Inc., Grey Wolf, a corporation domiciled in Texas, and I.E. Miller, a corporation domiciled in Louisiana, entered into a master service agreement that contained reciprocal indemnity provisions and provided that Texas law would apply to any issue arising under the contract.[40] The agreement contemplated work in four states, including Texas and Louisiana.[41] A verbal work order was issued by Grey Wolf for work to be performed in Louisiana, and

---

[38] See Gluck v. Unisys Corp., 960 F.2d 1168, 1179 n.8 (3d Cir. 1992); Edelman v. Chase Manhattan Bank, N.A., 861 F.2d 1291, 1294-95 (1st Cir. 1988); Corporación Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir. 1980) ("This is a federal question case . . . and it is appropriate that we apply a federal common law choice of law rule . . . .").

[39] See Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp., 502 F.3d 78, 81 (2d Cir. 2007) ("[W]hen conducting a federal common law choice-of-law analysis, absent guidance from Congress, we may consult the Restatement (Second) of Conflict of Laws."); Huynh v. Chase Manhattan Bank, 465 F.3d 992, 997 (9th Cir. 2006) ("Federal common law follows the approach outlined in the Restatement (Second) of Conflict of Laws."); Chan v. Soc'y Expeditions, Inc., 123 F.3d 1287, 1297 (9th Cir. 1997) ("Federal common law applies to choice-of-law determinations in cases based on . . . admiralty. . . . Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws.").

[40] 07-167, p. 1 (La. App. 3 Cir. 11/21/07); 970 So. 2d 703, 704.

[41] Id. at 706.

its employee, a Louisiana resident, was injured in the course of that work[42] due to I.E. Miller's negligence.[43] The Louisiana corporation (I.E. Miller) sought indemnity from the Texas corporation (Grey Wolf). The Louisiana court held that Texas law applied and refused to void the indemnity agreement under Louisiana's Oilfield Indemnity Act.[44] In reaching that decision, the Louisiana court first applied choice-of-law provisions contained in LOUISIANA CIVIL CODE articles 3540,[45] 3537,[46] 3515,[47] and comment (b) to article 3515.[48] Slightly more

---

[42] Id.

[43] Id. at 704.

[44] Id. at 707.

[45] That provision states: "All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537."

[46] Article 3537 provides:

Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

[47] Article 3515 provides:

Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each

52

than half (51.78%) of the work under the master service agreement was performed in Texas, approximately 30% was performed in Louisiana, and approximately 17% was performed in both Texas and Louisiana,[49] although the appellate court did "not give much weight to this information."[50] The court concluded "that the relationship of Louisiana is stronger to each party than the relationship of Texas to each party,"[51] but the court applied Texas law because the parties "would justifiably expect to be subjected to the law of Texas and would suffer minimal adverse consequences if subjected to that state's law"[52] and because "Texas' policy of upholding contracts which are freely and voluntarily entered into far outweighs Louisiana's policy of protecting oilfield subcontractors."[53] The court also candidly expressed its parochial concerns, explaining that Louisiana's oilfield indemnity law was designed to protect Louisiana subcontractors, and if enforced in this case, the law would prohibit a

---

state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

[48] Comment (b) to Article 3515 provides:

The objective is to identify "the state whose policies would be most seriously impaired if its law were not applied to that [particular] issue", that is, the state which, in light of its relationship to the parties and the dispute and its policies rendered pertinent by that relationship, would bear the most serious legal, social, economic, and other consequences if its law were not applied to that issue.

[49] King, 970 So. 2d at 706.

[50] Id. at 706 n.2.

[51] Id. at 706.

[52] Id. at 706-707

[53] Id. at 707.

Louisiana corporation from obtaining indemnity from a Texas corporation.[54] The court held that because Texas law would apply under the parties' choice-of-law provision as well as in the absence of that provision, the trial court erred in voiding the mutual indemnity provision.[55]

This court has applied Louisiana's choice-of-law code provisions as the initial step in determining whether the Louisiana Oilfield Indemnity Act applied to render unenforceable indemnity provisions at issue in a diversity case in which the injury had occurred in Louisiana state waters.[56] After a lengthy analysis of the factors set forth in Louisiana's civil code provisions regarding choice of law, we concluded that Louisiana law would govern in the absence of the choice-of-law provision,[57] and that application of Texas law under the choice-of-law provision would violate Louisiana public policy as expressed in the Oilfield Indemnity Act.[58] We consequently refused to enforce the indemnity provision.[59]

Because our existing precedent does not consider choice-of-law principles in a case in which OCSLA may apply, the parties have not briefed the questions that arise. I would remand to allow the parties and the district court to consider further what law governs the indemnity provisions at issue.

IV

---

[54] Id.

[55] Id.

[56] See Roberts v. Energy Dev. Corp., 235 F.3d 935 (5th Cir. 2000).

[57] Id. at 943.

[58] Id.

[59] Id. at 944.

The court's majority-of-the-work test is relatively easy to apply and provides a measure of predictability. These are commendable attributes. However, the court's opinion implicitly crafts a new federal common law choice-of-law rule to decide what law will govern a contract that has some connection with structures on or attached to the seabed of the OCS or with the seabed itself. The Supreme Court has admonished that "Congress made clear provision for filling in the 'gaps' in federal law" that is to be applied under OCSLA, and that Congress "did not intend that federal courts fill in those 'gaps' themselves by creating new federal common law."[60] We are to apply the adjacent state's law as federal law,[61] to the extent that it is not inconsistent with federal law.[62] I know of no "majority-of-the-work" test under federal law, even if federal common law that is inconsistent with Louisiana state law takes precedence under OCSLA.[63]

\* \* \* \* \*

For the foregoing reasons, I respectfully dissent.

---

[60] Chevron Oil Co. v. Huson, 404 U.S. 97, 104-05 (1971), overruled in part on other grounds by Harper v. Va. Dep't of Taxation, 509 U.S. 86 (1993).

[61] Id. at 103 ("The policies underlying the federal absorption of state law in the Lands Act make this result particularly obvious. As we pointed out in Rodrigue, Congress recognized that 'the Federal Code was never designed to be a complete body of law in and of itself' and thus that a comprehensive body of state law was needed."); id. at 104 ("[T]he Court of Appeals' approach [applying the laches doctrine through admiralty law] amounts to an inappropriate creation of federal common law."); cf. id. ("Congress specifically rejected national uniformity and specifically provided for the application of state remedies which demand state, not federal, statutes of limitation.").

[62] Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 487 (1981).

[63] See id. ("But Congress was not silent. It incorporated for this case the applicable law of Louisiana, but only '[t]o the extent [it is] not inconsistent with federal law. The statute does not distinguish between federal statutory and judge-made law. It would seem then that if Louisiana law is 'inconsistent,' [federal common law] controls. Doubt arises, however, because in OCSLA Congress borrowed a remedy provided by state law and thereby 'specifically rejected national uniformity' as a paramount goal.").